UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SS&C TECHNOLOGIES HOLDINGS, INC. AND ADVENT SOFTWARE, INC.,

Plaintiffs,

v.

D.E. SHAW & CO., L.P.,

Defendant.

23-CV-09158-TMR-OTW

**OPINION & ORDER**

Dated: July 24, 2026

Stephen R. Fishbein, John A. Nathanson, Christopher L. LaVigne, Eric S. Lucas and Benjamin Klebanoff, Allen Overy Shearman Sterling US LLP, of New York, N.Y., for plaintiffs SS&C Technologies Holdings, Inc. and Advent Software, Inc.

John M. Desmarais, Steven M. Balcof, Justin P.D. Wilcox and Marie E. Weisfeiler, Desmarais LLP, of New York, N.Y., Washington, D.C. and San Francisco, CA, for defendant D.E. Shaw & Co., L.P.

TIMOTHY M. REIF, Judge, United States Court of International Trade, Sitting by Designation:

Defendant and counterclaim plaintiff D. E. Shaw & Co., L.P. ("DESCO" or "counterclaim plaintiff") brings the instant action against SS&C Technologies Holdings, Inc. ("SS&C") and Advent Software, Inc. ("Advent") (collectively, "SS&C" or "counterclaim defendant"), alleging: (1) unlawful monopolization in violation of 15 U.S.C. § 2 of the Sherman Act; (2) attempted monopolization in violation of 15 U.S.C. § 2 of the Sherman Act; (3) unlawful tying in violation of 15 U.S.C. § 2 of the Sherman Act; (4) breach of contract; and (5) unfair competition in violation of

California's Unfair Competition Law. *See* Def. D.E. Shaw & Co.'s Second Am. Countercls. ("Second Am. Countercls."), ECF No. 124.

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") counterclaim defendant moves to dismiss the amended counterclaims. *See* Notice of Mot. to Dismiss DESCO's Second Am. Countercls., ECF No. 141; Mem. Of Law in Supp. of SS&C's Mot. to Dismiss DESCO's Second Am. Countercls. ("SS&C Br."), ECF No. 143; Reply Mem. of Law in Supp. of SS&C's Mot. to Dismiss DESCO's Second Am. Countercls. ("SS&C Reply"), ECF No. 163. For the reasons discussed below, the court grants counterclaim defendant's motion to dismiss.

**BACKGROUND**

## I. Parties in the instant action

Counterclaim plaintiff DESCO is a global asset manager that manages a range of investments for its customers. Second Am. Countercls. ¶ 22.

Counterclaim defendant SS&C is a business that provides software products to customers in the financial services industry. *Id.* ¶ 24. SS&C has a subsidiary, Advent, which SS&C acquired in 2015. *Id.*

## II. Procedural background

This action arises from a licensing dispute between SS&C and DESCO concerning SS&C's portfolio accounting software product, Geneva. *See* Second Am. Countercls.. On October 18, 2023, SS&C filed its complaint in the instant action, bringing claims against DESCO for: (1) violation of the Defend Trade Secrets Act

(“DTSA”), 18 U.S.C. § 1836, et seq.; (2) common law misappropriation of trade secrets; and (3) breach of contract. See Compl., ECF No. 1.

On June 5, 2025, this Court granted in part and denied in part DESCO’s motion to dismiss pursuant to FRCP 12(b)(6). *See SS&C Technologies Holdings, Inc. v. D.E. Shaw & Co., L.P.*, No. 23-CV-09158 (TMR), 2025 WL 1591012, at *17 (S.D.N.Y. June 5, 2025).

On July 17, 2025, DESCO filed its answer to the amended complaint along with five counterclaims. *See* Def.’s Answer to Pl.’s Am. Compl., ECF No.70; Def.’s Countercls., ECF No. 70.

On February 6, 2026, this Court granted DESCO’s motion for judgment on the pleadings pursuant to FRCP 12(c) and dismissed SS&C’s amended complaint. *See SS&C Technologies Holdings, Inc. v. D.E. Shaw & Co., L.P.*, No. 23-CV-09158 (TMR), 2026 WL 322630, at * 8 (S.D.N.Y. Feb. 6, 2026).

DESCO twice amended its counterclaims. *See* First Am. Countercls., ECF No. 93; Second Am. Countercls. The second amended counterclaims are the operative pleading in this case. On December 22, 2025, SS&C moved to dismiss DESCO’s second amended counterclaims. *See* SS&C Br. On January 20, 2026, DESCO filed its response brief. *See* Def. D.E. Shaw & Co’s Opp’n to SS&C’s Mot. to Dismiss Second Am. Countercls. (“DESCO Opp’n”), ECF No. 154.

## III. Factual background

For purposes of resolving SS&C's motion to dismiss, the court summarizes DESCO's factual allegations below.

According to DESCO's counterclaims, DESCO's use of SS&C's product, Geneva, is governed by several interrelated contracts spanning more than two decades. These agreements fall into three general categories: (1) licensing agreements to use Geneva; (2) agreements governing third-party "hosting" of Geneva; and (3) agreements governing maintenance services, including software updates and bug fixes. *See* Second Am. Countercls. ¶¶ 27, 35-47, 95, 102-03.

**A. License to use and resell Geneva**

SS&C, through its subsidiary Advent, develops and licenses Geneva, a portfolio accounting software ("PAS") product used by investment management firms and hedge funds. *See id.* ¶¶ 24-26. DESCO has licensed and used Geneva since 2003. *Id.* ¶ 27. In September 2003, SS&C[1] and DESCO entered into the Software License Support Agreement (the "SLSA"). *Id.* ¶¶ 27, 95. The SLSA granted DESCO a "fully paid-up, perpetual license to use Geneva." DESCO Opp'n at 2; *see also* Second Am. Countercls. ¶ 27. DESCO has continued to use Geneva pursuant to the Original License. Second Am. Countercls. ¶¶ 27, 33.

In 2015, SS&C and Arcesium, a non-party in this action, entered the Hosted Reseller Agreement (the "HRA") under which Arcesium became a licensed reseller of Geneva. *Id.* ¶ 44. In 2020, SS&C declined to renew the HRA with Arcesium. *Id.*

[1] The agreement was between DESCO and Advent. Second Am. Countercls. ¶¶ 27, 95. Advent later became an SS&C subsidiary; the court therefore refers to Advent as "SS&C" where the distinction is immaterial. *Id.* ¶ 3.

DESCO did not license Geneva pursuant to the HRA; rather, DESCO licensed Geneva under the SLSA. *Id.* ¶27.

**B. Geneva Hosting**

Geneva is a highly technical and specialized software that requires "specialized infrastructure and expertise" to operate. Second Am. Countercls. ¶ 43. Geneva may be operated either "on-premises" at a customer's location or through a third-party provider that maintains the computing environment and provides remote access to the software ("Geneva Hosting"). DESCO Opp'n at 2 (citing Second Am. Countercls. ¶¶ 15, 47).

In 2014, SS&C and DESCO executed an amendment to the SLSA (the "Amended License").[2] Second Am. Countercls. ¶ 27. The Amended License set forth the terms and conditions for DESCO to use a third-party hosting provider and prohibited DESCO from using a third-party service provider "that competes with any SS&C Advent portfolio accounting product." *Id.* ¶ 51.

Between 2003 and 2014, DESCO operated its Geneva instance "on-premise[]" (i.e., without a third-party hosting provider). DESCO Opp'n at 3 (citing Second Am. Countercls. ¶ 47). After obtaining permission to use a third-party hosting provider, DESCO selected Arcesium as its Geneva Hosting provider. *Id.* at 4; *see also* Second Am. Countercls. ¶ 67. In 2020, Arcesium launched its own portfolio accounting

[2] In prior decisions, this Court called this document the "Maintenance Amendment (With Hosting Language)" or the "MA". *See SS&C Technologies Holdings, Inc. v. D.E. Shaw & Co., L.P.*, No. 23-CV-09158 (TMR), 2025 WL 1591012, at *1 (S.D.N.Y. June 5, 2025). In the instant action, given that DESCO describes the document as the "Amended License," Second Am. Countercls. ¶ 43, the court uses that term.

software product, known as UBOR. Second Am. Countercls. ¶ 29.[3] DESCO nevertheless continued using Arcesium as its third-party Geneva Hosting provider, despite Arcesium's alleged development of a competing PAS platform in violation of the Amended License, until SS&C prohibited Arcesium from hosting DESCO's Geneva instance (i.e., DESCO's version of Geneva). *Id.* As a result, DESCO changed hosting providers between late 2021 and late 2022. Second Am. Countercls. ¶¶ 29, 48.

### C. Geneva Maintenance

In addition to licensing Geneva, SS&C provides customers with ongoing maintenance and support services for the software ("Geneva Maintenance"), including software updates, bug fixes and technical support. Second Am. Countercls. ¶ 35. Only SS&C is able to provide "necessary" maintenance services, such as "critical software updates and bug fixes," whereas third parties have the ability to provide "general" maintenance support, "such as [] telephone consultation service[s]." Second Am. Countercls. ¶¶ 35-36.

---

[3] On March 10, 2022, SS&C brought an action against Arcesium in this Court relating to Arcesium's development of a competing portfolio accounting software product UBOR. *See* Compl.; *SS&C Techs. Holdings, Inc. v. Arcesium LLC*, No. 1:22-cv-02009 (S.D.N.Y. Mar. 10, 2022), ECF No. 1. SS&C sought relief for Arcesium's alleged violation of the DTSA, common law misappropriation of trade secrets, unfair competition, breach of contract and breach of the covenant of good faith and fair dealing. *See id.* On December 20, 2024, the Court granted Arcesium's motion to dismiss with prejudice plaintiff's claims against it in the Arcesium action. *SS&C Techs. Holdings, Inc. v. Arcesium LLC*, No. 22-CV-02009 (TMR-OTW), 2024 WL 5186530, at *1 (S.D.N.Y. Dec. 20, 2024).

The terms of DESCO's Geneva Maintenance contract are governed by the SLSA. *Id.* ¶ 102. Pursuant to the terms of the SLSA, DESCO paid annual fees for Geneva Maintenance on a renewable, year-to-year basis. *Id.* ¶ 33. The SLSA could be "terminated" upon advance written notice prior to the end of the applicable maintenance term. *Id.* ¶ 102. DESCO paid these annual Geneva Maintenance fees from 2003 until 2023. *Id.* ¶ 103. On October 18, 2023, SS&C "terminated" DESCO's access to SS&C's maintenance services. *Id.* DESCO continues to use Geneva without maintenance services but alleges that it is required to "operate an outdated and unsupported version of Geneva." *Id.* ¶ 69.

**JURISDICTION AND STANDARD OF REVIEW**

The court exercises subject matter jurisdiction over plaintiff's federal law antitrust counterclaims pursuant to 28 U.S.C. §§ 1331 and 1337. The court exercises supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

A motion to dismiss counterclaims is evaluated under the same pleading standard as a motion to dismiss a complaint. *See GEOMC Co. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 99 (2d Cir. 2019) (holding that "a [] counterclaim, like all pleadings, must conform to the pleading requirements of *Twombly* and *Iqbal*").

To withstand a motion to dismiss, DESCO's counterclaims "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Olson v. Major League Baseball*, 29 F.4th 59, 71 (2d Cir. 2022) (quoting

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

The court is required to "draw all reasonable inferences in favor of the plaintiff." *S.E.C. v. Apuzzo*, 689 F.3d 204, 207 (2d Cir. 2012). But the court need not accept legal conclusions unsupported by factual allegations. *See Iqbal*, 556 U.S. at 663 (explaining that the presumption of truth does not apply to "threadbare recitals of a cause of action's elements, supported by mere conclusory statements"); *Twombly*, 550 U.S. at 555 (holding that a complaint must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action").

"Dismissal under [FRCP] 12(b)(6) is appropriate when a defendant raises a statutory bar, such as lack of timeliness . . . and it is clear from the face of the [counterclaims] . . . that the plaintiff's claims are barred as a matter of law." *Chalmers v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 3628416, at *3 (2d Cir., Dec. 15, 2025) (citing *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)).

## DISCUSSION

### I. Antitrust counterclaims

DESCO's antitrust counterclaims allege: (1) unlawful monopolization in violation of 15 U.S.C. § 2 of the Sherman Act; (2) attempted monopolization in violation of 15 U.S.C. § 2 of the Sherman Act; and (3) unlawful tying in violation of

15 U.S.C. § 2 of the Sherman Act. *See* Second Am. Countercls. ¶¶ 72-107.

To state a claim under Section 2 of the Sherman Act, a claimant must allege plausibly monopoly power (or a dangerous probability of achieving it) in a defined relevant market and anticompetitive conduct used to acquire or maintain that power. *See Verizon Commc'ns. Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993).

**A. Summary of antitrust allegations**

To provide context for the parties' arguments, the court begins by summarizing the relevant markets. DESCO alleges anticompetitive conduct in three markets: (1) the market for portfolio accounting software for complex funds (the "PAS market"); (2) the Geneva Hosting market; and (3) the Geneva Maintenance market. DESCO alleges that SS&C unlawfully monopolized (or attempted to unlawfully monopolize) the PAS market through exclusive dealing and de facto exclusive dealing. *See* Second Am. Countercls. ¶¶ 44-48, 67-72. DESCO alleges also that SS&C unlawfully monopolized (or attempted to unlawfully monopolize) both the Geneva Hosting and Geneva Maintenance aftermarkets through unlawful tying. *See id.* ¶¶ 37, 43-48. The court outlines DESCO's factual allegations regarding each market below.

**1. PAS market**

DESCO defines a "Complex Fund" as an investment fund with more than $5 billion in assets under management ("AUM") and high daily trading activity across

multiple asset classes. Second Am. Countercls. ¶¶ 9-10.[4] DESCO identifies "Portfolio Accounting Software" as software that provides post-trade accounting functionality necessary "to maintain accurate and reliable books and records" for investment portfolios and to meet legal and regulatory obligations. *Id.* ¶ 11.

Because Complex Funds engage in high-volume trading across multiple asset classes, DESCO alleges that these funds require PAS products capable of handling significantly greater scale, complexity and regulatory demands than accounting software used by other funds. *Id.* DESCO asserts that "[t]he vast majority of, if not all, Complex Funds use Portfolio Accounting Software." *Id.* ¶ 11.

DESCO is a Complex Fund[5] and is therefore a customer in the PAS market. *Id.* ¶ 22. SS&C develops and licenses "Geneva," a PAS market product. *Id.* ¶ 24. DESCO claims that SS&C has monopoly power, or a dangerous probability of acquiring monopoly power, in the PAS market. *Id.* ¶ 28. DESCO alleges that SS&C monopolized (or attempted to monopolize) the PAS market through exclusive dealing and de facto exclusive dealing. *Id.* ¶¶ 49-64.

**2. Geneva Hosting aftermarket**

An aftermarket refers to a market for parts or services associated with a

---

[4] DESCO alleges that assets under management and daily trading volume serve as proxies for fund complexity, as higher AUM and trading volume correlate with more sophisticated investment strategies and operational requirements. Second Am. Countercls. ¶¶ 9-10.

[5] DESCO asserts that, as of March 2025, it had more than $65 billion in assets under management and daily trading volumes exceeding 50,000 trades per day. *Id.* ¶ 22.

primary product. *See Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 476-77 (1992). Courts recognize that a firm may exercise market power in such a secondary market where the parts or services are specific to the primary product. *Id.*

DESCO describes the "Geneva Hosting" market as a distinct aftermarket consisting of the "provision of infrastructure on which Geneva can run." DESCO Opp'n at 3 n.1 (citing Second Am. Countercls. ¶¶ 43-44). DESCO is a customer in the Geneva Hosting aftermarket: DESCO previously self-hosted Geneva "on-premises;" however, in 2015, DESCO selected Arcesium as its Geneva Hosting provider. *Id.* at 3-4 (citing Second Am. Countercls. ¶ 67). Arcesium competes with SS&C in the Geneva Hosting aftermarket: SS&C offers a competing Geneva Hosting product to Arcesium's Geneva Hosting product. Second Am. Countercls. ¶ 66; DESCO Opp'n at 3-4.

**3. Geneva Maintenance aftermarket**

DESCO alleges that "Geneva Maintenance" is a "distinct aftermarket" consisting of maintenance services for the Geneva software provided to customers such as DESCO. Second Am. Countercls. ¶ 36. DESCO claims that only SS&C can provide "necessary" maintenance services, including "critical software updates and bug fixes," while third parties may provide "general" maintenance support, such as "telephone consultation services." *Id.* ¶¶ 35-36. DESCO is a customer in the Geneva Maintenance aftermarket. *Id.*

**B. Statute of limitations**

A party must bring an antitrust action "within four years after the cause of action accrued." 15 U.S.C. § 15b. "Dismissal under [FRCP] 12(b)(6) is appropriate when a defendant raises a statutory bar, such as lack of timeliness . . . and it is clear from the face of the [counterclaims] . . . that the [] claims are barred as a matter of law." *Chalmers v. Nat'l Collegiate Athletic Ass'n*, 2025 WL 3628416, at *3 (2d Cir., Dec. 15, 2025) (citing *Sewell*, 795 F.3d at 339).

Counterclaim defendant SS&C argues that DESCO's "antitrust claims related to all three of its alleged markets" are barred by the statute of limitations. SS&C Br. at 2. Specifically, SS&C alleges that DESCO's antitrust counterclaims are untimely because they are based on contractual provisions executed more than four years before DESCO filed its counterclaims. *See id.* at 14-16.

DESCO maintains that its antitrust counterclaims are timely because: (1) the statute of limitations was tolled on October 18, 2023, when SS&C filed the original complaint in this action; (2) new "overt act[s]" inflicted new antitrust injuries constituting a "continuing violation" within the applicable statute of limitations period; and (3) "damages were speculative until well within the relevant limitations period." DESCO Opp'n at 11-15. The court will consider each argument in turn.

**1. Legal framework**

The court concludes that the statute of limitations period for DESCO's antitrust counterclaims is measured from October 18, 2019, four years before SS&C filed the original complaint in this action.

The parties dispute whether the four-year statute of limitations should be measured to run from 2019 or 2021. DESCO Opp'n at 11; SS&C Reply at 3. Any antitrust violation occurring before the start date is time-barred. 15 U.S.C. § 15b. DESCO argues that its antitrust counterclaims are *compulsory* and that any anticompetitive conduct occurring after October 18, 2019, four years before SS&C filed its complaint in this case, will render the antitrust claims timely. DESCO Opp'n at 11. SS&C maintains that DESCO's antitrust counterclaims are *permissive* and that only anticompetitive conduct occurring after 2021, four years before DESCO filed its counterclaims, will render the claims timely. SS&C Reply at 3.

Courts in this district have held that the filing of an action tolls the limitations period for compulsory counterclaims. *See Meadowbrook-Richman, Inc. v. Associated Financial Corp*., 325 F. Supp. 2d 341, 363 (S.D.N.Y. 2004) (holding that the "timeliness of compulsory counterclaims is measured from the date the complaint was filed in the case"); *Aramony v. United Way of America*, 969 F. Supp. 226, 231 (S.D.N.Y.1997) ("Under [FRCP] 13, a counterclaim tolls its limitations period at the filing of the initial complaint if it is compulsory, but not until the service of the counterclaim if it is permissive.").

A counterclaim is compulsory if it "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim." Fed. R. Civ. P. 13(a). The Second Circuit takes a "broad view," and considers whether there is a "logical relationship" between the claim and the counterclaim such that "considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit."

*United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979) (internal quotation marks omitted). The "logical relationship" approach does not require "an absolute identity of factual backgrounds . . . but only a logical relationship between them." *Id.* at 22.

In the original complaint in this action, SS&C alleged that DESCO misappropriated SS&C's confidential information and breached contractual agreements governing access to and use of the Geneva software platform. *See* Am. Compl. ¶¶ 86-118. DESCO's counterclaims, in turn, allege that SS&C used those same agreements and restrictions governing Geneva—including the 2003 SLSA, the 2014 Amended License, and the 2015 HRA—to maintain monopoly power and exclude competition in the alleged markets. *See* Second Am. Countercls. ¶¶ 35-48, 66.

The court concludes that there is a "logical relationship" between SS&C's claims and DESCO's counterclaims because they involve the same agreements, course of dealing and alleged conduct governing the parties' use of Geneva. *See Gary Friedrich Enters.v. Marvel Enters.*, No. 8-CV-1533 (BSJ) (JCF), 2011 WL 13262163, at *2 (S.D.N.Y. May 4, 2011) (holding that counterclaims are compulsory where they arise from the same product and course of dealing between the parties). Accordingly, the limitations period runs from October 18, 2019—four years before SS&C filed the original complaint. DESCO's antitrust counterclaims are timely as to any cause of action that accrued after October 18, 2019. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 330-40 (1971).

### 2. Timeliness

"A cause of action for violation of the antitrust laws ordinarily accrues as soon as there is an injury to competition," or as soon as "a defendant commits an act that injures a plaintiff[]." *Higgins v. N.Y. Stock Exch., Inc.*, 942 F.2d 829, 832 (2d Cir. 1991); *see also Zenith Radio*, 401 U.S. at 338. The U.S. Court of Appeals for the Second Circuit (the "Second Circuit") has held that an antitrust claim premised on a contract accrues at the time of contracting, even if the plaintiff's injury is felt later. *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019). The Second Circuit reasons that the operative anticompetitive act and injury occur when the parties decide to enter the contract, and that later "performance of a contract," is merely a "manifestation of the [initial act]." *Id.* at 69. The four-year limitations period therefore runs from execution of the alleged anticompetitive contract—meaning that claims brought more than four years after a contract was executed are time-barred unless an exception applies.

Two exceptions may restart the date of accrual for the limitations period. First, under the "overt act" doctrine, "an overt act that restarts the statute of limitations is characterized by two elements: (1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Sabre*, 938 F.3d at 68 (quoting *DXS, Inc. v. Siemens Medical Systems, Inc,* 100 F.3d 462, 467 (6th Cir. 1996)); *see also Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) ("each overt act that is part of the violation and that injures the plaintiff . . . starts the statutory period running

again.") (citation omitted). Second, in the "rare case" where damages are too speculative to estimate at the time of the antitrust violation, *Higgins*, 942 F.2d at 832, an antitrust claim may accrue when the injury occurs rather than when the anticompetitive conduct occurred. *See Klehr*, 521 U.S. at 190-91 ("in such a case, a claim for the injuries that had been speculative would accrue when those injuries occurred").

To determine the accrual date in this case, the court: (1) identifies the alleged anticompetitive conduct underlying each claim and the initial injury to competition; and then (2) considers whether either exception to the general accrual rule—the "overt act" doctrine or the speculative-damages exception—applies.

**a. Injury to competition**

SS&C argues that DESCO's antitrust counterclaims are untimely because they arise from allegedly anticompetitive contracts executed "more than a decade ago," and that the claims accrued when those contracts were executed. SS&C Br. at 2.

DESCO alleges four forms of anticompetitive conduct: (1) exclusive dealing in the PAS market; (2) de facto exclusive dealing in the PAS market; (3) tying in the Geneva Hosting market; and (4) tying in the Geneva Maintenance market. Second Am. Countercls. ¶¶ 50-63; 72-93. The court addresses each allegation to determine whether DESCO's counterclaims are premised on contracts executed outside the four-year limitations period, which began on or before October 18, 2019.

As explained below, the court concludes that DESCO's exclusive dealing claim in the PAS market and its tying claims in the Geneva Hosting and Geneva Maintenance aftermarkets are based on contracts executed before October 18, 2019, but that DESCO's "de facto exclusive dealing" claim in the PAS market is not clearly premised on such a contract and therefore cannot be dismissed as untimely on the same basis.

**i. PAS market: exclusive dealing**

The court concludes that DESCO's "exclusive dealing" claim in the PAS market is based on the 2014 Amended License between DESCO and SS&C, which governs DESCO's access to third-party Geneva hosting providers.

DESCO bases its "exclusive dealing" claim on alleged contractual restrictions on customers' use of third-party Geneva hosting providers that purportedly limit competition in the PAS market. Second Am. Countercls. ¶ 47.

Exclusive dealing requires "'substantial foreclosure of competition in the relevant market.'" *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, 383 F. Supp. 3d 187, 234 (S.D.N.Y. 2019) (quoting *Com. Data Servers, Inc. v. Int'l Bus. Machines Corp.*, No. 00CIV5008 (CM)(LMS), 2002 WL 1205740, at *7 (S.D.N.Y. Mar. 15, 2002)). This framework may apply to restrictions imposed on customers because rivals in the PAS market compete to provide services to those customers. *See United States v. Visa*, 788 F. Supp. 3d 585, 611-613 (S.D.N.Y. 2025). Where contractual terms or technical barriers limit customers' ability to purchase

from or transition to competing PAS providers, those practices may effectively deny rivals access to the market. *See id.*

It is clear from the face of the counterclaims that DESCO's exclusive dealing claim rests on a contractual provision executed in 2014, which falls outside the limitations period. *See* Countercls. ¶¶ 49-53; *see also Sewell*, 795 F.3d at 339 (holding that a statute-of-limitations defense may be resolved on a motion to dismiss only when the untimeliness of the claim is apparent from the face of the complaint).

DESCO maintains that "exclusive dealing arrangements," which "required" customers "to purchase Geneva Hosting only from companies that did not compete with any SS&C [PAS] product," DESCO Opp'n at 27, "prevents companies that may have the resources and access to develop a [PAS] product from entering the market." Second Am. Countercls. ¶ 52. However, DESCO alleges only that *contractual* restrictions on Geneva hosting providers effectively prevent customers from integrating with or switching to competing PAS systems, thereby foreclosing rivals from the market. *Id.* ¶¶ 49-53. DESCO's alleged injury arises from the 2014 Amended License, which required DESCO to purchase Geneva Hosting only from companies that did not "compete[] with any SS&C software product." *Id.* ¶ 47. Accordingly, DESCO's exclusive dealing claim in the PAS market accrued in 2014 and is time-barred absent the application of an exception to the general accrual rule.

### ii. PAS market: de facto exclusive dealing

DESCO's basis for claiming de facto exclusive dealing is imprecise, to put it kindly. DESCO allegations contained for the first time in DESCO's reply suggest a link to a contractual provision in the 2003 SLSA. DESCO Opp'n at 24-25. Were such a link to exist, it would be time barred.

"Because courts look to the actual effects" of the alleged anticompetitive conduct, "the federal antitrust statutes recognize 'de facto exclusive dealing'" where the alleged conduct does not contain an express exclusivity requirement but functionally forecloses rivals' access to the relevant market. *See Visa*, 788 F. Supp. 3d at 609 (citation omitted).

DESCO argues that SS&C has engaged in de facto exclusive dealing by "assert[ing] that the organization of DESCO's data that is [sic] output from Geneva is [SS&C]'s proprietary and trade secret information." Second Am. Countercls. ¶ 60. DESCO alleges that SS&C's data ownership provisions of the SLSA prevent DESCO from transitioning to competing PAS systems and thereby induce DESCO to deal exclusively with SS&C. *See id.* As noted, the 2003 SLSA governs the parties' data ownership provisions. *See id.* ¶ 55. To the extent that DESCO's claim rests on those contractual provisions, the claim is time-barred.

DESCO argues also that it identified two additional contracts between SS&C and other customers that deny customers' rights to control certain data. DESCO Opp'n at 25-26 (citing Countercls. ¶ 60). DESCO claims that these "contractual provisions . . . 'in practice,' require customers 'to exclusively use SS&C's services

and limit customers' ability to deal with rivals.'" *Id.* at 24 (quoting *CoStar Grp. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1072 (9th Cir. 2025). Those agreements show only that SS&C expressly reserved ownership control rights as to customers *other than* DESCO. *See* Second Am. Countercls. Ex. 11 at 4; Ex. 12.

"A cause of action for violation of the antitrust laws ordinarily accrues as soon as . . . a defendant commits an act that injures a *plaintiff*[]." *Higgins,* 942 F.2d at 832 (emphasis supplied) (citation omitted). Accordingly, to the extent that DESCO's elusive de facto exclusive dealing theory rests on anticompetitive contractual restrictions, any alleged antitrust injury against DESCO accrued in 2003.

However, the rule "in the statute of limitations context is that dismissal is appropriate only if a complaint clearly shows the claim is out of time." *Harris v. City of N.Y.,* 186 F.3d 243, 250 (2d Cir. 1999). In this case, DESCO's enigmatic de facto exclusive dealing counterclaim does not "clearly show[]" that the claim is based on a contract and is therefore time-barred. *Id.* Instead, DESCO alleges that SS&C engaged in de facto exclusive dealing by "assert[ing]" purported ownership rights through "trade secret" litigation such as the claims asserted in this action. Second Am. Countercls. ¶ 59 (citing Am. Compl. ¶¶ 64-65).

The operative language in DESCO's de facto exclusive dealing claim is that SS&C "asserts" proprietary rights—language that describes a legal position advanced by SS&C, typically in litigation, rather than a restriction imposed by

contract.[6] *See id.* ¶¶ 59-61. Moreover, the only example of anticompetitive de facto exclusive dealing conduct that DESCO alleges that SS&C committed against DESCO is SS&C's assertion of trade secret misappropriation claims in this action. *See id.* ¶ 59 (citing Am. Compl. ¶¶ 64-65). Therefore, out of an abundance of caution to counterclaim plaintiff due to the imprecision of its pleadings, the court addresses below whether the *Noerr-Pennington* doctrine bars DESCO's de facto exclusive dealing claim to the extent that the claim is based on litigation conduct. *See infra* Section I.C.

**iii. Geneva Hosting market: tying**

The alleged anticompetitive "tying" in the Geneva Hosting market occurred in 2014, when DESCO agreed in the Amended License to purchase Geneva Hosting only from companies that did not compete with any SS&C PAS product. Second Am. Countercls. ¶¶ 45, 51. "A tying arrangement is an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product." *E & L Consulting, Ltd. v. Doman Indus. Ltd.*, 472 F.3d 23, 31 (2d Cir. 2006) (citation modified). In the Geneva Hosting market, DESCO alleges that SS&C "tied Geneva Hosting to sales of Geneva through anticompetitive restrictions on Geneva Hosting providers." DESCO Opp'n at 26; *see also* Second Am. Countercls. ¶¶ 44-47.

---

[6] The language "asserts" means "to compel or demand acceptance or recognition of something," Assert, Merriam Webster, https://www.merriam-webster.com/dictionary/assert (last visited July, 9, 2026), or "to maintain or defend (claims, rights, etc.)." Assert, Dictionary.com, https://www.dictionary.com/browse/assert (last visited July, 9, 2026).

DESCO's tying claim in the Geneva Hosting market is based on the 2014 Amended License, which required DESCO to purchase Geneva Hosting only from companies that did not compete with any SS&C portfolio accounting product. Second Am. Countercls. ¶ 51. Under the terms of the 2014 Amended License, DESCO was required to switch hosting providers once its hosting provider (which later became Arcesium) offered a competing PAS product. *Id.* ¶¶ 47-48. Accordingly, DESCO's exclusive dealing claim in the Geneva Hosting aftermarket accrued in 2014 and is time-barred absent an exception to the general accrual rule.

#### iv. Geneva Maintenance market: tying

The alleged anticompetitive tying in the Geneva Maintenance market occurred in 2003, when DESCO agreed to purchase a package of maintenance services, which bundled "optional" maintenance services (i.e. telephone consultation) together with "necessary" services (i.e., bug fixes and upgrades). Second Am. Countercls. ¶ 36. Accordingly, given that DESCO's tying claim in the Geneva Maintenance aftermarket accrued in 2003, the claim is time-barred absent an exception to the general accrual rule.

### b. Overt acts

The court considers next whether DESCO has alleged an "overt act" that occurred after October 18, 2019.

As noted, in the Second Circuit, an antitrust claim based on an allegedly anticompetitive contract, in general, accrues when the contract is executed. *See Sabre*, 938 F.3d at 68-69. The claim may accrue at a later date, however, if the

plaintiff alleges that the defendant committed an "overt act" in furtherance of the anticompetitive scheme. *See Klehr*, 521 U.S. at 189. DESCO asserts that SS&C committed various anticompetitive "overt acts" after October 18, 2019, which constituted "continuing violation[s]" of DESCO's exclusive dealing claims in the PAS market and tying claims in the Geneva Hosting and Geneva Maintenance aftermarkets. *See* DESCO Opp'n at 11-14.

An "overt act" constituting a "continuing violation" of the Sherman Act sufficient to restart the date on which an antitrust claim accrues must satisfy two elements: "(1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Sabre*, 938 F.3d at 68 (citation omitted). If the conduct merely carries out a preexisting contractual agreement, the Second Circuit treats this conduct as the continuing effects or "reaffirmation" of the original violation rather than an overt act. *See Id.* at 69 (holding that payment of a "supracompetitive" price pursuant to an allegedly unlawful contract is not an overt act sufficient to restart the date of accrual); *see also In re Ciprofloxacin Hydrochloride Antitrust Litigation*, 261 F. Supp. 2d 188, 228 (E.D.N.Y. 2003), aff'd 544 F.3d 1323 (2d Cir. 2008) (holding that payments made pursuant to an allegedly anticompetitive settlement agreement were continuing effects of the agreement).

DESCO alleges that SS&C committed two "overt acts" after October 18, 2019. DESCO alleges that the first overt act was SS&C's "refusal to renew the HRA" with Arcesium, DESCO's preferred hosting provider, in 2020. DESCO Opp'n at 12.

DESCO maintains that this act amounted to an "overt act" that provided a "continuing violation" of SS&C's allegedly anticompetitive conduct in *both* the PAS market and the Geneva Hosting aftermarket. *See* DESCO Opp'n at 12-13. DESCO alleges that SS&C's second overt act was the "wrongful termination" of DESCO's access to Geneva maintenance in 2023. DESCO Opp'n at 14. According to DESCO, this action provided a "continuing violation" of SS&C's allegedly anticompetitive conduct in the Geneva Maintenance aftermarket. *See* DESCO Opp'n at 14.

**i. 2020 refusal to renew the HRA**

The court addresses the two alleged overt acts in turn. With respect to the first, SS&C's refusal to renew the HRA with Arcesium, the court concludes that this action was not an "overt act" sufficient to restart the date on which DESCO's antitrust claims accrued.

The HRA was a 2015 agreement between SS&C and Arcesium under which Arcesium was authorized to resell and host Geneva for certain customers. Second Am. Countercls. ¶ 44. In 2020, SS&C declined to renew the HRA with Arcesium. *Id.*. DESCO characterizes SS&C's refusal to renew the HRA with Arcesium as a "refusal to deal" that constitutes an "overt act" sufficient to restart the limitations period under the continuing violation doctrine. *See* DESCO Opp'n at 12-13.

As noted, an "overt act" must satisfy two elements: "(1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and (2) it must inflict new and accumulating injury on the plaintiff." *Sabre*, 938 F.3d at 68 (citation omitted). In this case, SS&C's refusal to renew the HRA fails the second

condition—did not inflict a "new and accumulating injury" based on DESCO's counterclaims. *See id.* In particular, DESCO's counterclaims failed to show that SS&C's refusal to renew the HRA restricted DESCO's access to Geneva or Geneva Hosting services or otherwise caused DESCO to suffer any new and accumulating injury.

An overt act restarts the statute of limitations only if it "inflict[s] new and accumulating injury on the *plaintiff*." *Sabre*, 938 F.3d at 68 (emphasis supplied); *see also Zenith Radio Corp.*, 401 U.S. at 338 ("Each time a plaintiff is injured by an act of the defendants[,] a cause of action accrues to him . . . ."); *Klehr*, 521 U.S. at 189 ("[E]ach overt act that is part of the violation and that injures the *plaintiff* . . . starts the statutory period running again.") (emphasis supplied).

DESCO did not license Geneva pursuant to the HRA; DESCO licensed Geneva under the 2003 SLSA. Second Am. Countercls. ¶¶ 27, 33, 95. Therefore, SS&C's nonrenewal of the HRA did not alter DESCO's license to use Geneva or otherwise inflict a new injury on DESCO as a customer in the PAS market. Similarly, DESCO does not connect the non-renewal of the HRA to *DESCO's* access to Geneva Hosting services because the HRA did not provide DESCO access to those services; rather, the HRA provided *Arcesium*, a nonparty, access to those services.

DESCO claims injury also as a result of having to switch hosting providers in 2022. *See* Second Am. Countercls. ¶ 48. However, DESCO does not allege how the non-renewal of the HRA forced DESCO to switch hosting providers. Indeed, DESCO never used the HRA as the contractual basis for DESCO's access to hosting

services.[7] Second Am. Countercls. ¶¶ 27, 47. Any alleged costs of switching hosting providers therefore cannot be attributed to SS&C's non-renewal of the HRA. Further, DESCO does not argue that the 2020 non-renewal imposed any new contractual restriction on DESCO or changed the terms governing DESCO's access to hosting providers. *See id.* ¶ 46. Accordingly, SS&C's refusal to renew the HRA in 2020 does not constitute an "overt act" sufficient to restart the date on which an antitrust claim accrues.

#### ii. 2023 termination of DESCO's access to Geneva maintenance services

The alleged anticompetitive tying in the Geneva Maintenance market occurred in 2003, when DESCO agreed to purchase a package of maintenance services, which bundled "optional" maintenance services (i.e. telephone consultation) together with "necessary" services (i.e., bug fixes and upgrades). Second Am. Countercls. ¶ 36. DESCO maintains that its monopolization claim is timely in the Geneva Maintenance market because SS&C's "wrongful termination" of DESCO's Geneva Maintenance in 2023 was an "overt act," which provided a "continuing violation" of SS&C's "coercion in the Geneva Maintenance aftermarket." DESCO Opp'n at 14 (citing Second Am. Countercls. ¶¶ 39-41, 69).

DESCO does not allege any facts to support the claim that SS&C's termination of DESCO's Geneva Maintenance was an "overt act" in support of any "continuing violation" for its antitrust *tying* claim in the Geneva Maintenance

---

[7] The 2014 Amended License, not the HRA, governed the terms of DECSO's access to third-party Geneva Hosting providers. Second Am. Countercls. ¶¶ 27, 47.

market. *See Klehr*, 521 U.S. at 189 (holding that a continuing violation requires that "each overt act *that is part of the violation* and that injures the plaintiff . . . starts the statutory period running again") (emphasis supplied). The October 18, 2023 termination did not reimpose or restructure the alleged bundling of optional maintenance services with necessary maintenance services, nor did it newly condition access to software updates or fixes on the purchase of additional services. *See* Second Am. Countercls. ¶¶ 39-41, 69. To the contrary, the 2023 termination *ended* DESCO's access to both necessary *and* optional Geneva Maintenance services altogether. *Id.* The requirement that DESCO purchase unnecessary maintenance services to obtain necessary services was embedded in the 2003 SLSA. Second Am. Countercls. ¶ 27. And even though DESCO continued to pay maintenance fees until 2023, *id.*, these allegedly anticompetitive payments were a "manifestation of the decision . . . to enter the contract, rather than an independent overt act of its own." *Sabre*, 938 F.3d at 69. Accordingly, SS&C's termination of DESCO's access to Geneva maintenance services in 2023 does not constitute an "overt act" sufficient to restart the date on which an antitrust claim accrues.

#### c. Speculative damages

The court concludes that DESCO's damages were not "so speculative" as to delay the accrual of its antitrust claims. *Zenith Radio Corp.*, 401 U.S. at 327.

DESCO's second legal basis for asserting that its antitrust claims are timely is that its claims, based on contracts executed in 2014 and 2003, did not accrue at

the time of contracting because DESCO's alleged damages were "speculative" until a later date. DESCO Opp'n at 14.

Under Second Circuit law, an antitrust claim based on an allegedly anticompetitive contract, in general, accrues when the contract is executed. *Sabre*, 938 F.3d at 68-69. The law recognizes two narrow exceptions: (1) later "overt act[s]" may restart accrual (addressed *supra* at sections I.B.2.b); and (2) in the "rare case" in which damages are not "calculable" at the time of the antitrust violation, accrual may be delayed. *SL-x IP S.à.r.l. v. Merril Lynch, Pierce, Fenner, & Smith, Inc.*, 2023 WL 2620041, at *3 (2d Cir. Mar. 24, 2023). When damages are "so speculative," *Klehr*, 521 U.S. at 181, an antitrust *claim* may accrue "when those injuries occurred," even if the anticompetitive *conduct* that gave rise to the claims occurred more than four years earlier. *Id.* at190-91 (citing *Zenith*, 401 U.S. at 339-40). The Second Circuit has made clear that the speculative-damages exception requires a plaintiff to show that damages were *not* "calculable" or "provable" at the time that the allegedly anticompetitive contract was executed. *SL-x*, 2023 WL 2620041 at *3 (holding that damages were "calculable" at time of injury); *see also Chalmers*, 2025 WL 3628416 at *4 (requiring plaintiffs to demonstrate calculability).

DESCO fails to allege facts showing that its damages were not calculable at the time the allegedly anticompetitive contracts were executed. DESCO contends that damages in the PAS and Geneva Hosting markets remained speculative "until at least 2022," when DESCO allegedly incurred "more than one million dollars to

switch away from Arcesium's Geneva Hosting." DESCO Opp'n at 10, 15 (citing Second Am. Countercls. ¶ 67).

DESCO argues that damages in the Geneva Maintenance market were speculative "at least until October 18, 2023," when SS&C terminated DESCO's access to Geneva Maintenance and allegedly exposed DESCO to operational risks associated with using an outdated version of the software. *Id.* at 15. DESCO asserts that it felt the effects of the allegedly anticompetitive contractual restrictions after October 18, 2019; however, DESCO does not explain *why* those damages were speculative, or not "calculable" until later dates. *See SL-x,* 2023 WL 2620041 at *3. Instead, DESCO alleges only that these damages "were uncertain and not capable of reasonable estimation." DESCO Opp'n at 14-15. Once again, DESCO's allegation is conclusory. *See Iqbal*, 556 U.S. at 663-64.

In the PAS and Geneva Hosting markets, DESCO alleges that it incurred migration costs in 2022 when it moved its Geneva hosting away from Arcesium and that damages from the termination of Geneva Maintenance became concrete in 2023. DESCO Opp'n at 15. But the fact that the precise amount of those costs and consequences materialized or manifested later does not render the damages speculative earlier if they were "calculable" at that time. *Chalmers*, 2025 WL 3628416 at *4. In fact, DESCO's own pleadings support this conclusion. For example, DESCO argues that the 2014 Amended License prohibited it from using a hosting provider that competed with SS&C and that doing so would require migration of its hosting services. Second Am. Countercls. ¶¶ 47, 50-51. DESCO

therefore knew that switching costs *could* arise from that contractual restriction. Switching costs, while not precise, were "calculable" at the time. Migration expenses of this type are economic injuries that can be estimated ordinarily using internal records, contracts and vendor pricing. *See* Second Am. Countercls. ¶ 46 (explaining migration costs). DESCO provided previously Geneva hosting services in-house and therefore possessed information relevant to estimating hosting and migration costs. *See id.* ¶¶ 46-47. And DESCO does not explain why these costs, while uncertain, were not capable of reasonable estimation or calculation earlier.

The Second Circuit's decision in *Chalmers* confirms that damages are not "speculative" merely because they depend on future economic consequences. *See Chalmers*, 2025 WL 3628416, at *4. In that case, student-athletes challenged NCAA rules restricting the commercial use of their name, image and likeness ("NIL"). *See id.* The Second Circuit held that the students' injuries were calculable when the athletes signed agreements restricting those rights because their NIL "had a value at that time," even though the precise amount of damages remained uncertain. *Chalmers*, 2025 WL 3628416, at *4. Similarly, in *SL-x*, the plaintiff alleged that an anticompetitive conspiracy forced it to sell its property at a steep discount in 2015 and argued that damages were speculative until that sale occurred. *See SL-x*, 2023 WL 2620041, at *1. The Second Circuit rejected that argument, explaining that, although the ultimate sale price became known only later, the plaintiff's damages were "calculable" earlier. *SL-x*, 2023 WL 2620041, at *3.

In the Geneva Maintenance market, DESCO alleges only that its "tying damages were speculative and unprovable at least until October 18, 2023," when SS&C terminated DESCO's access to Geneva Maintenance and allegedly exposed DESCO to "operational risks from having to use an outdated version of Geneva." DESCO Opp'n at 15 (citing Second Am. Countercls. ¶¶ 36-38, 40, 69). DESCO asserts that it must now expend resources to manage potential disruptions caused by software bugs and compatibility issues associated with the outdated software. *Id.* DESCO does not explain why the alleged damages were so speculative that they could not have been estimated reasonably or "calculated" earlier. Nor does DESCO connect its assertion of speculative damages to the antitrust injury that DESCO alleges—namely, the purported *tying* of optional Geneva Maintenance services to necessary ones. *See supra* Section I.B.2.a.iii. Accordingly, DESCO's damages were not "so speculative" as to delay the accrual of its antitrust claims.

**C. Noerr-Pennington immunity**

The court concludes that the *Noerr Pennington* doctrine immunizes SS&C from liability as to DESCO's remaining antitrust allegation—relating to de facto exclusive dealing.

SS&C argues that DESCO's "de facto exclusive dealing" allegations "are merely claims that SS&C has asserted against DESCO in litigation, which are protected from antitrust liability by the *Noerr-Pennington* doctrine." SS&C Br. at 16-17. SS&C maintains that "[a]side from its strained allegations about this

litigation, DESCO has not alleged any other exclusionary conduct that purportedly constitutes de facto exclusive dealing." *Id.* at 16.

DESCO responds that its "de facto exclusive dealing allegations do not rest *solely* on" SS&C's litigation. DESCO Opp'n at 25. Instead, DESCO maintains that it "plausibly alleges de facto exclusive dealing through *contractual provisions* that, in practice, require customers to exclusively use SS&C's services and limit customers' ability to deal with rivals." DESCO Opp'n at 24 (emphasis supplied). However, as explained above, to the extent that DESCO's claim rests on contractual provisions, the claim is time-barred. *See supra* Section I.B.2.a.ii. Beyond this assertion, the only example of anticompetitive de facto exclusive dealing conduct that DESCO alleges that SS&C committed against DESCO is SS&C's assertion in its litigation against DESCO of trade secret misappropriation. *See* Second Am. Countercls. ¶ 59 (citing Am. Compl. ¶¶ 64-65).

Under *Noerr-Pennington*, efforts to influence government action—including through litigation—are protected by the First Amendment "right of petition" and are immune from Sherman Act liability "irrespective of anti-competitive intent." *Miracle Mile Assocs. v. City of Rochester*, 617 F.2d 18, 20-21 (2d Cir. 1980) (citing *Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961)); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right to petition."). "Courts have extended *Noerr-Pennington* to encompass concerted efforts incident to litigation," including threats of litigation and settlement negotiations.

*Primetime 24 Joint Venture v. Nat'l Broadcasting, Co.*, 219 F.3d 92, 100 (2d Cir. 2000). In sum, suing or threatening to sue a competitor, even if motivated by anticompetitive intent, is protected conduct immune from antitrust liability. *Id.*

The court concludes that the *Noerr-Pennington* doctrine immunizes SS&C's conduct from antitrust liability because DESCO's theory challenges SS&C's asserted litigation position and DESCO does not argue that SS&C's litigation conduct falls within any exception to Noerr-Pennington immunity. *See* DESCO Opp'n at 24-26.

## II. Remaining state law claims

In light of the failure of the antitrust counterclaims, the court declines to exercise supplemental jurisdiction over DESCO's remaining state-law counterclaims.

Pursuant to 28 U.S.C. § 1367(c)(3), the court "'may decline to exercise supplemental jurisdiction' if it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also Camarda v. Snapple Distribs., Inc.*, 346 F. App'x 690, 693 (2d Cir. 2009).

"Once a district court's discretion is triggered under § 1367(c)(3), it balances the traditional 'values of judicial economy, convenience, fairness, and comity,' . . . in deciding whether to exercise jurisdiction." *Kolari*, 455 F.3d at 122 (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)). "In weighing these factors, the district court is aided by the Supreme Court's additional guidance . . .

that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Id.* (quoting *Cohill*, 484 U.S. at 350 n.7); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

The instant antitrust counterclaims are the only counterclaims over which the court possesses original jurisdiction. *See* Second Am. Countercls. ¶¶ 4, 5, 97; 28 U.S.C. § 1337; 28 U.S.C. § 1331. And the early stage of this litigation "point[s] toward declining to exercise jurisdiction over the remaining state-law [counter]claims." *Kolari*, 455 F.3d at 122 (quoting *Cohill*, 484 U.S. at 350 n.7). Accordingly, plaintiff's remaining state-law breach of contract and violation of California Unfair Competition Law claims are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is GRANTED. Plaintiff's amended complaint is DISMISSED.

The Clerk of the Court is respectfully directed to terminate the open motion at ECF No. 99.

SO ORDERED.

/s/ Timothy M. Reif
Timothy M. Reif, Judge,
United States Court of International Trade
*Sitting by Designation*
United States District Court for the
Southern District of New York

Dated: July 24, 2026
New York, New York